Bernard S. Meyer, J.
This petition for a writ of habeas corpus was met by a motion to dismiss for insufficiency which, however, the court deems waived by respondent’s proceeding *701 to trial on the matter. The motion to dismiss for insufficiency is, therefore, denied, but the petition is dismissed on the merits.
Petitioner is the mother and respondent the father of three children, all born during the period petitioner and respondent were living together as husband and wife, though, because of petitioner’s prior undissolved marriage, they never married. The children are now 12, 10 and 7. Petitioner also had three children by her first marriage, who are now 26, 20 and 17, who also resided with petitioner and respondent while they were living together. The youngest of petitioner’s children by her first marriage continued to live with respondent even after petitioner left him and, except for brief periods, remained with him until April, 1960, when she moved to a separate abode, apart from both petitioner and respondent.
In October, 1957, petitioner, while still living with respondent, had her picture and name published in a magazine as a person interested in male companionship and thus became acquainted with her present husband. In February, 1958, she left respondent’s home in Nassau and went to live up-State with her present husband but did not marry him until February, 1959. Whether in the meantime her first husband died or the marriage was dissolved does not appear, but petitioner testified she considers herself legally married to her present husband.
From the time she left in February, 1958 until one of the three children involved in this proceeding became ill, during the early part of 1959, petitioner visited the three children but four times, each time for one day only. While the child was ill she visited more frequently, some of the time staying at respondent’s home. In April, 1960 she and her present husband picked up two of the children at the school bus stop and attempted to take the third, who, however, refused to go. The two children remained up-State with petitioner and her present husband during the Easter vacation, but were taken back by respondent at the end of that week.
During the period after petitioner left the Nassau abode, respondent worked nights so that he could be with the children during the daytime. He has resided with the children since their respective births. His sister, who is 25 years of age, also assists him with the children, living with them in the home. Respondent is Catholic; the two older children have received Communion, the youngest is scheduled to begin instruction in September, 1960. Petitioner’s present husband is Baptist but testified that he is willing that the children be raised as Catholics, and that he is anxious to have the children in his home.
*702 The above facts were either testified to or admitted by failure to deny. At the suggestion of the parties the court also obtained a report from the Probation Department relative to the three adults, copy of which has been made available to both parties, and talked with the children out of the presence of the parties, but with a court stenographer present to record the conversation. All three of the children expressed a wish to remain with respondent and not to be sent up-State with petitioner and her new husband. The court concludes that, though the similarity of their answers suggests that they had discussed the matter with an adult, presumably respondent, nonetheless they have a strong feeling for respondent and a very real apprehension about being sent to live with petitioner and her present husband in a new and strange community.
Petitioner relies heavily on the provision of section 138 of the Domestic Relations Law that in records other than birth certificates or judicial proceedings in which birth out of wedlock is at issue ‘ ‘ it shall be sufficient for all purposes to refer to the mother as the parent having the sole custody of the child, and no explicit reference shall be made to illegitimacy.” The last few words reveal the purpose of the section: to remove the stigma of illegitimacy from the child. The section cannot, however, be construed as a legislative declaration that only the mother can, whatever the circumstances, have custody of a child born out of wedlock. The Appellate Division, Second Department, clearly declared otherwise in People ex rel. Meredith v. Meredith (272 App. Div. 79) and the Court of Appeals affirmed (297 N. Y. 692). The core of the decision is contained in the following passage (p. 82):
“ The rule is that the mother has the right to the custody of an illegitimate child as against the father, though the father has the right to the custody as against a stranger. (2 Kent’s Comm. [14th ed.], 317; Matter of Doyle, 1 Clarke Ch. 154; People ex rel. Trainer v. Cooper, 8 How. Pr. 288, 293.) The very statement of the rule shows that, under certain circumstances, the father has a right to the custody of his illegitimate child. Where, as in the case at bar, it appears that the mother is not a proper and suitable person the court, in behalf of the child, will interfere with the mother’s custody of an illegitimate child and direct that it be placed elsewhere. (Robalina v. Armstrong, 15 Barb. 247; People v. Landt, 2 Johns. 375.) The proper statement of the rule is that the mother of an illegitimate child is prima facie entitled to its custody and, when she is a proper and suitable person, the court will award its custody to *703 her as against the father or anyone else. (10 Carmody on New York Pleading and Practice, § 45, and cases cited.)
1 ‘ When the question of the custody of children is brought before the court by habeas corpus, it is the duty of the court to look solely to their welfare and decide accordingly. (Matter of Lee, 220 N. Y. 532, 538.) To paraphrase the language of Judge Cardozo in Finlay v. Finlay (240 N. Y. 429, 433-434), the court acts as parens patriae to do what is best for the interest of the child and puts itself in the position of a ‘ wise, affectionate and careful parent ’; the court does not determine ‘ rights ’ as between a parent and a child or as between one parent and another; the court interferes for the protection of infants, qua infants, by virtue of the prerogative which belongs to the State as parens patriae. True, the case last cited involved the custody of legitimate children, but what was said applies with equal force to illegitimate children. (People v. Kling, 6 Barb. 366.) The rule which makes the welfare of the child of predominant importance and the paramount consideration in determining who is entitled to its custody applies to illegitimate, as well as to legitimate, children. (7 Am. Jur., Bastards, § 60, and cases cited.) ”
Custody of the child was taken from the mother and given to the father in that case, the court finding that the mother’s misconduct, whether the result of mental weakness or inherent wickedness, made her obviously ‘ ‘ not a proper and suitable person to have custody of the infant.”
That decision was followed in People ex rel. Kessler v. Wehnert (114 N. Y. S. 2d 598) which took custody from a mother who, having abandoned the father and the child, later returned and took the child away without the father’s consent, the court stating (p. 599) that it was “ satisfied that the physical and moral welfare of the child will best be served by according custody to the petitioner.” Similar determinations are to be found in People ex rel. Mahoff v. Matsoui (139 Misc. 21) where custody was divided to give the mother custody during weekdays while the father worked and the father custody from 5:00 p.m. Friday to 8:00 a.m. Monday of each week, and in People ex rel. Lewisohn v. Spear (174 Misc. 178) where custody was awarded the father, the mother having voluntarily surrendered custody of the child to the father and then changed her mind, the court finding (p. 179) that she was “ not temperamentally or otherwise prepared to care for the child, and that its interest is best served by superseding any claimed natural rights which the mother may tender.”
*704 The harsh view of the common law that a natural child was films nullius — nobody’s child- — -no longer prevails. Apparently, however, a legal distinction still exists between legitimate and illegitimate children as respects the prima facie right to their custody (cf. Domestic Relations Law, § 70 with People ex rel. Meredith v. Meredith, supra). But the only hard and fast rule in determining which parent shall have custody of a child, whether born in or out of wedlock, is the welfare and happiness of the child.
Second only to love in the parent-child relationship is stability. Abandonment of her children by petitioner, lasting for an extended period during which only infrequent visits were made, followed by an unauthorized and unannounced taking of two of them for a period of a week, evidences an instability which contrasts sharply with the father’s warm and sustained relationship with the children. He has, with the help of his sister, and with a determination sufficient to impel him to change from daywork to nightwork so he could be with the children during the day, maintained for them a proper home and seen to it that they obtain both public school and religious education. The court, well aware that the isolated expression of preference by a child may not be given disproportionate meaning, nonetheless concludes that the welfare of the children will best be served by leaving their custody with respondent, with provision, however, for visitation with petitioner during either Christmas or Easter school vacation and for either the month of July or August during the Summer recess. In reaching its conclusion, the court has not overlooked petitioner’s recent change of residence in order to provide additional bedrooms for the children, nor the willingness and ability of her present husband to support the children. The basis of its decision has been ‘ ‘ the manner in which a wise and affectionate parent in the particular case would act for the child’s good.” (People ex rel. Lewisohn v. Spear, supra, p. 179.)
The writ is, therefore, dismissed. To protect the interests of the children who will continue to reside and attend school and church in Nassau County, this decision will be published under fictitious names and the file will be ordered sealed.